UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CHERYLL VOSBURGH,

                Plaintiff,

      -against-                         5:08-CV-0653 (LEK/TWD)

AMERICAN NATIONAL RED CROSS,
*et al.*,

                Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

Plaintiff Cheryll Vosburgh ("Plaintiff") commenced this employment discrimination action on June 20, 2008, against the American National Red Cross (the "Red Cross" or "National"), the American Red Cross of Tompkins County (the "Chapter"), Jennifer Yarbrough ("Yarbrough"), Cynthia Gordineer ("Gordineer"), Dawn Darby ("Darby") (collectively, "Defendants"), and several other Defendants who have since been dismissed. Dkt No. 1 ("Original Complaint"); see also Docket. Presently before the Court is Defendants' Motion for summary judgment. Dkt. No. 140 ("Motion"). For the following reasons, the Motion is granted in part and denied in part.

## II.    BACKGROUND

### A. The Chapter

The Chapter is a unit of the Red Cross, a charitable organization that provides domestic disaster relief, as well as services to the poor and underprivileged. Dkt. No. 141 ("Defendants' SMF") ¶¶ 13-14. The Chapter relies on volunteers to carry out its mission. Id. ¶ 16. The Chapter is governed by an unpaid Board of Directors (the "Board"). Id. ¶ 18.

### B. Plaintiff's Employment

The exact nature of Plaintiff's position at the Chapter is disputed by the parties. According to Defendants, Plaintiff began working at the Chapter in July 1995 as the Resource Development and Communications Director. Defs.' SMF ¶ 21. When Plaintiff came to the Chapter, she was interested in a human resources position, but her initial position also included responsibilities related to development, public relations, and communications. Id. ¶ 23. From 2007 to 2008, Plaintiff's title was Director of Human Resources, Development and Communications ("HR and Development Director"). Id. ¶ 24.

According to Plaintiff, although she first came to the Chapter to fill the Resource Development and Communications Director position, her title was promptly changed to Director of Human Resources, Development and Communications. Dkt. No. 159 ("Plaintiff's Affidavit") ¶¶ 6, 12. This change was made to clarify that the position's "resource development" duties meant "human resources and fundraising." Id. ¶ 12. Her job title remained the same for the rest of her tenure at the Chapter. Id.

The position summary for the HR and Development Director stated that the position's overall purpose was "to oversee the completion of all work related to public relations, financial development, and human resource administration." Defs.' SMF ¶ 26. In terms of financial development responsibilities, the position called for being responsible for "the development and management of the overall development budget and work plan," overseeing "the development, direction, and implementation of the Chapter's annual fund raising campaign," including "mail and telemarketing campaigns," and "grant solicitation and emergency disaster relief appeals." Id. ¶ 28.

According to Plaintiff, the meaning of "financial development" in the context of her position

was narrow. Pl.'s Aff. ¶ 16. Her responsibilities included ensuring that an annual mail campaign was conducted, special events were held, and, in one case, a grant was completed and submitted. Id. Plaintiff emphasizes that the Chapter had more than one revenue generating department, as Health and Safety was responsible for funding its own department with revenue generating activities. Id. Additionally, three other departments raised program funds through their own grants. Id. According to Plaintiff, the Executive Director was responsible for grant writing, solicitation of major donations, and planned giving. Id. The Board was also responsible for fundraising. Id.

With respect to human resources, the written job description called for Plaintiff to be responsible for the "development of volunteer and paid staff to meet the personnel needs of the Chapter programs and services," including assuring "the integrity of personnel policies and contract provisions," "widespread attention to and use of volunteers in all areas of management and service delivery," and maintenance of personnel files. Defs.' SMF ¶ 27. Plaintiff claims that the human resources needs of the Chapter grew significantly over time, but she was not provided with any additional support to fulfill the increasing responsibilities. Pl.'s Aff. ¶ 18.

The job description for Plaintiff's position provided that Plaintiff would spend 40% of her time on financial development, 10% of her time on public relations/communication, and 50% on human resource management. Defs.' SMF ¶ 25. Plaintiff does not dispute that the written job description provided a 50%-40%-10% time allocation, but states that in practice her job priorities were quite different. Id. ¶ 14. When there were competing priorities, Plaintiff took direction from the then-Executive Director, Charles Nocera ("Nocera"), as to how her time should be spent. Id. Plaintiff states that she, Nocera, and the Board all became aware that the demands of Plaintiff's position had grown over the years and could no longer be filled by one person. Id.

3

## C. Revenue Concerns

In 2005, the Board was concerned that the Chapter's revenue was too low. Defs.' SMF ¶ 29; Pl.'s Aff. ¶ 22. According to Defendants, the Board believed that the Chapter's administration costs were too high given the Chapter's relatively small size. Defs.' SMF ¶ 30. As of 2005, other chapters had begun taking advantage of a Red Cross initiative that offered regionally-shared administrative services for finance and human resources. Id. ¶¶ 31-32.

According to Plaintiff, as of 2005, the Red Cross had begun providing support to Chapter staff by answering questions, making suggestions, or helping to "problem solve," but did not offer or provide any administrative services for finance or human resources. Pl.'s Aff. ¶ 26. The Chapter's senior staff did not learn of the plan to provide shared administrative services until 2007. Id. Furthermore, the regional services that were to provide support to the Chapter were shut down in April 2008. Id.

## D. Reorganization Task Force

In 2005, the Chapter created a reorganization task force to evaluate how the Chapter might run more effectively and efficiently. Defs.' SMF ¶¶ 35-37. One of the Task Force's concerns was that the Chapter's revenue stream was not keeping up with increasing expenses. Id. ¶ 38.

Early in the task force's evaluation, its members considered substantially altering Plaintiff's position by creating a separate director of development position, leaving Plaintiff responsible for human resources and youth services. Id. ¶ 39. However, the task force determined that creation of a full-time development position at that time was not financially feasible. Id. ¶ 46.

According to Defendants, a November 2006 performance appraisal of Plaintiff by Nocera included various criticisms in relation to her development responsibilities. Id. ¶¶ 50-52. It also

4

noted that Plaintiff's job description, along with that of all senior staff, would be revised during the 2007 fiscal year to reflect the recommendations of the reorganization task force.  Id. ¶ 49.  Plaintiff states that the 2006 performance appraisal, read in context, was overall positive.  See Pl. Aff. ¶¶ 64-68.

### E. Gordineer

While Nocera was Executive Director, the task force's recommendations, including possible changes to Plaintiff's position, were not implemented.  Defs.' SMF ¶ 53.  Nocera was fired in May 2007.  Id. ¶ 54.  While the Chapter searched for a new Executive Director, Gordineer, who was then the CEO for the Southern Tier Chapter, was designated as the Interim Executive Director, a position she held from May 5, 2007, until December 2, 2007.  Id. ¶ 55.  The Board informed Gordineer that during Nocera's tenure, the Board had considered restructuring to address a lack of fundraising.  Id. ¶ 56.  Gordineer reviewed the Chapter's 2006 Field Evaluation System-Chapter Performance Standards Scorecard ("2006 Scorecard"), which she believed highlighted many areas in need of improvement, including financial development and fundraising.  See id. ¶¶ 57-66.

Plaintiff states that although Gordineer was appointed Interim Executive Director, she retained her position as CEO of the Southern Tier Chapter and only visited the Tompkins County Chapter twenty-two times during her entire tenure as Interim Executive Director.  Pl.'s Aff. ¶ 74.  Plaintiff also states that the 2006 Scorecard was initially inaccurate due to Nocera's failure to send data to National Headquarters.  Id. ¶ 82.  When Gordineer brought her concerns about the Scorecard to the staff, they realized what had happened, found the missing information, and sent it to National Headquarters, resulting in a revised Scorecard that was "not nearly as dire as the initial report."  Id.

Gordineer reviewed the job descriptions and performance appraisals for staff, including

Plaintiff. Defs.' SMF ¶ 74. Gordineer did not believe that the Chapter, given its size, required an employee focusing a substantial amount of time on human resources, particularly in light of the availability of regionally-shared services. Id. ¶¶ 77, 80-81. Gordineer informed Plaintiff that she should spend less time on human resources and more time on fundraising. Id. ¶¶ 82-85. Plaintiff's 2007 performance appraisal stated that Plaintiff "must increase her attention to development and should be spending 60 - 70% of her time on fundraising." Id. ¶ 87. It further stated that "a new executive will be likely to hold her accountable for fundraising outcomes, which has not been the case in the past." Id.

Plaintiff states that the Chapter had significant human resources needs due to its operation and staffing of a homeless shelter, something not all chapters did. Pl.'s Aff. ¶ 118. According to her, the 2007 performance appraisal was the only occasion when Gordineer told her she would need to increase the amount of time focused on financial development. Id. ¶ 136.

### F. Yarbrough

On December 3, 2007, Yarbrough became the new Executive Director of the Chapter. Defs.' SMF ¶ 94. In the process of recruiting and hiring Yarbrough, the Board informed her that the Chapter required change, including improved fundraising and visibility. Id. ¶¶ 100-02.

During her first month at the Chapter, Yarbrough reviewed employees' jobs descriptions and met with employees to discuss their jobs. Defs.' SMF ¶¶ 105-06. Defendants state that Yarbrough met with Plaintiff during her first month at the Chapter. Id. 107. Plaintiff denies that, and states that Yarbrough did not meet with her regarding her position until late February 2008, nearly three months after Yarbrough became Executive Director. Pl.'s Aff. ¶ 174.

Defendants state that Yarbrough expected Plaintiff to work with her on fundraising and

development but that Plaintiff was not doing so, instead concentrating the majority of her time on human resources. SMF ¶¶ 108-110. In Yarbrough's view, Plaintiff's concentration on human resources was "unnecessary," "unproductive," and "uncalled for." Id. ¶¶ 113, 115.

Plaintiff states that, during the first months of Yarbrough's tenure, Yarbrough took personnel actions that caused "fallout and upheaval" at the Chapter—namely, disciplining or firing several senior staff members. Pl.'s Aff. ¶¶ 182-84. Plaintiff was therefore required to spend a majority of her time addressing the human resources issues that arose from Yarbrough's actions. Id. ¶ 184.

Defendants state that in or around January or early February 2008, Yarbrough spoke with Plaintiff about revamping her job. Defs.' SMF ¶ 127. Yarbrough was considering making Plaintiff's job part-time and reducing her pay. Id. ¶ 128. Yarbrough informed Plaintiff that she did not believe the Chapter needed a full time human resources/volunteer management position. Id. ¶ 129.

Plaintiff states that Yarbrough first spoke to her about revamping her job on February 26, 2008, when she informed Plaintiff that she wanted a part-time human resources professional. Pl.'s Aff. ¶¶ 218, 220. Plaintiff asked Yarbrough if she would consider a full-time position if it incorporated other duties such as volunteer management, and Yarbrough replied that she would. Id. ¶ 220.

On February 6, 2008, Plaintiff emailed the Red Cross's Northeast Service Area Volunteer Management Human Resources Officer seeking information regarding human resources roles at other chapters of the Red Cross. Defs.' SMF ¶ 131. Defendants assert that this email was prompted by Yarbrough's meeting with Plaintiff regarding her position. Id. Plaintiff states that she sent the email because of Gordineer's statement that she should spend less time on human resources. Pl.'s

Aff. ¶ 26.

### G. Plaintiff's CCL Complaint

The Red Cross maintains a Concern Connection Hotline ("CCL"), which may be used by volunteers, the general public, employees, vendors, or others to report allegations or concerns regarding potential fraud, waste, or abuse, and illegal, unsafe, or unethical conduct. Id. ¶ 216. The CCL is operated by a third-party vendor. Id. ¶ 218. Accordingly, when a caller contacts the CCL, she initially speaks to an employee of the vendor. Id. ¶ 219. An initial report is then given to the Red Cross's Investigations, Compliance, and Ethics unit, which is responsible for handling complaints. Id. ¶ 220.

Plaintiff first called the CCL on or about February 20, 2008. Defs.' SMF ¶ 222; Pl.'s Aff. ¶ 410. As referenced *supra*, Defendants assert that this call took place after Yarbrough met with Plaintiff to discuss changing her position, whereas Plaintiff asserts that Yarbrough only met with Plaintiff to discuss changing her position after Plaintiff had contacted the CCL. See Defs.' SMF ¶¶ 105-07; Pl.'s Aff. ¶ 174. Plaintiff also states that she had previously called the Red Cross Ombudsman's office regarding Yarbrough and Gordineer's allegedly illegal actions, and was told that she and others should call the CCL. Pl.'s Aff. ¶ 408.

On February 22, 2008, Plaintiff called the CCL and alleged that Gordineer discriminates against employees based on their age and time of service with the organization. Defs.' SMF ¶ 223; Pl.'s Aff. ¶ 410; Dkt. No. 144 ("Brewer Declaration"), Ex A ("CCL Complaint"). Plaintiff also alleged that, on February 21, 2008, Michelle VanOrman ("VanOrman"), the then-Business Manager of the Chapter, informed Plaintiff that Gordineer and Yarbrough planned to "create a part-time human resources position and a full-time development position to replace" Plaintiff's current role.

8

CCL Compl.; Dkt. No. 163 ¶¶ 2-3, 62-63.  Plaintiff also stated her belief that the plans to restructure her position were "an attempt to remove her from the chapter because of her seniority, pay, and age of 54."  CCL Compl.; Defs.' SMF ¶ 225; Pl.'s Aff. ¶ 414.

Plaintiff also submitted written complaints to the CCL investigator.  Defs.' SMF ¶ 226; Brewer Dec., Ex. B ("Written Complaint").  Her written complaints contained similar allegations, including that VanOrman told Plaintiff that Yarbrough planned to reduce Plaintiff's hours, but possibly return the position to full-time in a year.  Written Compl. at 4.  Plaintiff wrote that she believed Yarbrough planned to wait a reasonable amount of time before returning the position to full-time to avoid any suspicion of age discrimination.  Id.; see also Pl.'s Aff. ¶ 416.  Plaintiff also stated that on November 14, 2007, Gordineer, as Interim Executive Director, told Plaintiff of plans to change her position to one with more emphasis on development.  Defs.' SMF ¶ 227; Written Compl. at 1.  Plaintiff's complaints were investigated by Linda Ruthardt, a Red Cross employee, who ultimately determined that Plaintiff's allegations of discrimination were unsubstantiated. Defs.' SMF ¶¶ 228-29.

Plaintiff states that immediately after she made her CCL complaint, Yarbrough initiated a campaign of hostile behavior, including sending Plaintiff disparaging emails and issuing warnings regarding Plaintiff's job performance.  Pl.'s Aff ¶ 496.  Additionally, Plaintiff states that Yarbrough told her that she knew people had filed complaints, that she knew who they were, and that she would "wait until the cream rises to the top" and then "skim it off."  Id.

**H.  Alleged Performance Deficiencies**

Defendants state that, between February 2008 and April 2008, Plaintiff exhibited various specific deficiencies related to her development and fundraising duties, and that she was "working

9

against the interests of the Chapter." Defs.' SMF ¶¶ 140-68. On April 11, 2008, Yarbrough and

Dawn Darby ("Darby"), a representative of the Board's Human Resources Committee, met with

Plaintiff for six hours to discuss human resources issues, Dkt. No. 143 ("Yarbrough Declaration")

¶ 29, and Yarbrough met with Plaintiff again on April 15, 2008 to discuss her job responsibilities,

id. ¶ 30. On April 21, 2008, Yarbrough issued Plaintiff a written warning charging her with

insubordination. Defs.' SMF ¶ 160; Yarbrough Dec., Ex. M. Plaintiff disputes the legitimacy of

each of the alleged performance deficiencies, and states that the written warning, which was the first

she received in her thirteen years of employment with the Chapter, was unwarranted. Pl.'s Aff.

¶ 284.[1]

## I. Reassignment

On May 5, 2008, Yarbrough sent an email to Plaintiff containing a job description for the

proposed position of Director of Development and requested that Plaintiff post the job opening.

Defs.' SMF ¶ 172; Yarbrough Dec., Ex. O. On May 7, 2008, Yarbrough and a member of the

Board's Human Resources Committee met with Plaintiff. Defs.' SMF ¶ 181. Yarbrough informed

Plaintiff that, effective immediately, she was being reassigned to the part-time position of Volunteer

Recruitment Coordinator, with a reduction in salary. Id. ¶ 182. Yarbrough later emailed Plaintiff a

written notice of these changes. Id. ¶ 188. Plaintiff then left work early because she did not feel

well. Id. ¶ 189. She filed a request for medical leave later that day. Id. ¶ 191. Over the ensuing

weeks, Yarbrough and Plaintiff exchanged various communications disputing the Chapter's leave

policies. Id. ¶¶ 194-204. Plaintiff never returned to work at the Chapter, and Yarbrough informed

Plaintiff that her employment had ended on July 31, 2008. Id. ¶ 205.

---

[1] The specific facts referenced in this paragraph are discussed in detail *infra*.

**J. Procedural History**

Plaintiff commenced this action on June 20, 2008, and subsequently filed an Amended Complaint on June 23, 2008. Original Compl.; Dkt. No. 21 ("First Amended Complaint"). In the First Amended Complaint, Plaintiff asserted various claims against the Red Cross, the Chapter, Yarbrough, Gordineer, and members of the Board, including claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and age discrimination, disability discrimination, and retaliation claims under the New York Human Rights Law ("NYSHRL"), N.Y. EXEC. LAW §§ 290-301. First Am. Compl.; Dkt. No. 64 ("October 2009 Order") at 2-3. By Memorandum-Decision and Order dated October 27, 2009, the Honorable Neal P. McCurn, U.S. District Judge, found that Plaintiff was not terminated from her employment, and granted summary judgment to Defendants on Plaintiff's FMLA claims and on Plaintiff's NYSHRL claims to the extent they were premised on her alleged termination. Oct. 2009 Order. The Court also dismissed several Defendants from the case. Id.

On January 5, 2010, Plaintiff filed her Second Amended Complaint, asserting that: (1) her reassignment was in retaliation for her complaints regarding age discrimination, in violation of the NYSHRL; and (2) her reduction in pay violated New York Labor Law § 193.[2] Dkt. No. 67 ("Second Amended Complaint"). Plaintiff seeks declaratory and monetary relief, as well as attorney's fees and costs. Id. at 18. Defendants filed their Motion on January 17, 2014. Mot.; Defs.' SMF; Dkt. No. 142 ("Memorandum"). Plaintiff filed a Response[3] and Defendants filed a

---

[2] The Second Amended Complaint does not include an age discrimination claim. See Second Am. Compl.

[3] Frustratingly, Plaintiff's Response to Defendant's Statement of Material Facts does not comply with Local Rule 7.1(a)(3). See Pl.'s SMF. Nevertheless, because Plaintiff has provided an

Reply.  Dkt. Nos. 164 ("Plaintiff's SMF"); 165 ("Response"); 176 ("Reply").

## III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the non-moving party will bear the burden of proof on a specific issue at trial, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  Id.  If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact.  Id.  This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).  At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir.

_____

Affidavit responding to Defendants' Statement of Material Facts, see Pl.'s Aff., the Court has endeavored to determine which of Defendants' asserted facts Plaintiff controverts.

1998).  A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them."  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    NYSHRL

### A.    Retaliation

#### 1. Legal Standard

The NYSHRL prohibits an employer from discriminating or retaliating against an employee because the employee opposed discriminatory employment practices.  See N.Y. EXEC. LAW § 296(1)(e), (3-a)(c).  A retaliation claim under the NYSHRL proceeds according to the familiar burden-shifting framework established in McDonnell Douglas Corporation v. Greene, 411 U.S. 792 (1973).  See Forrest v. Jewish Guild for the Blind, 819 N.E.2d 998, 1015 (N.Y. 2004).  Under this framework, a plaintiff must first make out a prima facie case by showing that: (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.  See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2012); Forrest, 819 N.E.2d at 1022.  "A plaintiff's burden of establishing a *prima facie* case is *de minimis*."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).  If the plaintiff meets this minimal burden, the burden shifts to the employer, who must offer legitimate, nonretaliatory reasons for the adverse action.  See Delrio v. City of New York, 938 N.Y.S.2d 149, 151 (App. Div. 2012); see also Meiri v. Dacon, 759 F.2d 989, 996-97 (2d Cir. 1985).  If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been terminated.  See

<u>Univ. of Texas Southwestern Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2534 (2013). A plaintiff alleging retaliation for complaining about a discriminatory employment practice must show that retaliation was a "but-for" cause of the adverse action, and not simply a "substantial" or "motivating" factor in the employer's decision.[4] <u>Id.</u> at 2526, 2533. "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 846 (2d Cir. 2013).

"To establish its entitlement to summary judgment in a retaliation case, a defendant must demonstrate that the plaintiff cannot make out a prima facie claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual." <u>Delrio</u>, 938 N.Y.S.2d at 151 (citing <u>Forrest</u>, 819 N.E.2d 998).

### 2. Discussion

#### a. Prima Facie Case

Defendants challenge only the last element of the prima facie case, arguing that Plaintiff cannot demonstrate a causal connection between her CCL Complaint and her subsequent reassignment. Mem. at 11.

---

[4] "New York State courts have yet to address the impact of the Supreme Court's recent holding in <u>Nassar</u> on the NYSHRL, nor has the Second Circuit provided the district courts of this Circuit with guidance as to this issue." <u>Dall v. St. Catherine of Siena Med. Ctr.</u>, 966 F. Supp. 2d 167, 191 n.12 (E.D.N.Y. 2013). However, given that the New York Court of Appeals has consistently stated that analogous federal statutory standards are applied in interpreting the NYSHRL, the Court applies the but-for causation standard articulated in <u>Nassar</u>. <u>See id.</u>; <u>Sanderson v. N.Y.S. Elec. & Gas Corp.</u>, 560 F. App'x 88, 93 (2d Cir. 2014) (applying <u>Nassar</u> to both state and federal retaliation claims without discussion).

A plaintiff may demonstrate causation by, *inter alia*, "showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence." Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quotation marks omitted). In general, a temporal gap of less than two months is sufficient to give rise to an inference of causation. See Mazurkiewicz v. N.Y.C. Health & Hosps. Corp., No. 09 Civ. 5962, 2010 WL 3958852, at *5 (S.D.N.Y. Sept. 16, 2010). However, even much longer gaps may be bridged by an intervening pattern of retaliatory treatment. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 175 (2d Cir. 2005) (noting that earlier, non-actionable acts of retaliation occurring soon after protected activity could show a "chain of events" connecting the protected activity and subsequent adverse actions); Chan v. NYU Downtown Hosp., No. 03 Civ. 3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004) ("[E]vidence of an intervening pattern of antagonism between the [complainant] and her employer could support an inference that an alleged retaliatory act that was taken against the complainant was causally related to her complaint of discrimination.").

Here, Plaintiff engaged in protected activity in February, and suffered an adverse reassignment in May. The roughly two and a half month gap between these events is bridged by what Plaintiff characterizes as a campaign of retaliation—i.e., repeated criticisms and warnings concerning Plaintiff's job performance. This evidence is sufficient to show causation for purposes of a prima facie case.

Defendants counter that Plaintiff cannot show a causal connection between the CCL Complaint and her reassignment because plans to restructure her job were in place *before* Plaintiff complained about discrimination. See Mem. at 11-12. Indeed, as Defendants point out, the primary focus of Plaintiff's CCL Complaint was a supposed plan to create a part-time human resources

15

position and a full-time development position to replace Plaintiff's position, with either the part-time position or termination being offered to Plaintiff. See CCL Compl.; Mem. at 12; Pl.'s Aff. ¶ 412.

"[T]o establish that an adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must postdate the protected activity." Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 27 (1st Cir. 2012). Accordingly, an employer need not suspend previously planned personnel decisions upon discovering that an employee has engaged in protected activity. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). In this case, however, although a rational factfinder could determine that Plaintiff's reassignment was "part of a larger plan set in motion long before" Plaintiff made the CCL Complaint, the factfinder could also reasonably conclude that "matters were in flux" until after Plaintiff made the CCL Complaint. See Trainor, 699 F.3d at 27. The latter interpretation is supported by the fact that plans to restructure Plaintiff's position were discussed in hypothetical terms at various times prior to 2008, but were not put into place until shortly after she complained about discrimination. Furthermore, although Yarbrough states that she was contemplating reassigning Plaintiff to a part-time position at a reduced salary prior to Plaintiff's CCL Complaint, Defs.' SMF ¶¶ 105-07, Plaintiff states that Yarbrough said she would consider a full-time human resources position if it included other duties, suggesting that a final decision to reduce Plaintiff's position to part-time had not yet been made, see Pl.'s Aff. ¶ 174. A court's duty in reviewing a motion for summary judgment is limited to finding genuine disputes of fact, "not to deciding them." Gallo, 22 F.3d at 1224. Accordingly, the record adequately demonstrates causation for purposes of Plaintiff's prima facie case.

### b. Legitimate Nonretaliatory Reason

Defendants argue that Plaintiff's reassignment was part of a legitimate organizational restructuring plan.  See Mem. at 13.  More specifically, Defendants state that Plaintiff was reassigned because the Chapter needed to increase fundraising and development, and Plaintiff performed those functions poorly.  See id. at 12-14.  As discussed further *infra*, Defendants identify several discrete incidents of deficient performance that occurred in 2008.  Accordingly, the burden shifts to Plaintiff to show that these explanations for her reassignment are pretext for retaliation.

### c. Pretext

#### i. Legal Standard

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  Zann Kwan, 737 F.3d at 846.  Such discrepancies provide evidence from which a reasonable factfinder might conclude that the employer's explanations are a pretext for retaliation.  See id.  An employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false *and* that retaliation was the real reason, see Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995), but a finding of falsity may, in appropriate circumstances, allow the factfinder to infer the ultimate fact of intentional retaliation, see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 250 (2d Cir. 2005).

#### ii. Restructuring Plan

Defendants argue that the Chapter's financial situation was dire, due in part to Plaintiff's

17

poor performance of her development and fundraising duties. Mem. at 13. Plaintiff has provided

evidence that the Chapter's financial situation was not so challenging, that her fundraising-related

job duties were secondary, and that her performance of those duties was considered adequate. See,

e.g., Pl.'s Aff. ¶ 82; Dkt. No. 163. Additionally, although Yarbrough spoke with Plaintiff

concerning possible restructuring of her job due to the need for better fundraising, Plaintiff states

that Yarbrough first discussed this with her *after* she made the CCL Complaint. Furthermore, it is

unclear precisely when the plan to reduce Plaintiff's position to part-time became final. Whether or

not Plaintiff's reassignment was legitimately based on a restructuring plan aimed to increase

fundraising is therefore an issue of disputed fact.

### iii. Discrete Incidents

Additionally, for each of the discrete instances of allegedly poor job performance identified

by Defendants, Plaintiff has produced evidence from which a factfinder could reasonably conclude

that these proffered explanations are false. First, Defendants state that Yarbrough counseled

Plaintiff regarding her shortcomings in planning the "heroes" fundraiser event. Defs.' SMF ¶¶ 140-

41. Specifically, Defendants state that "Plaintiff had contacted a potential sponsor . . . even though

a Board member had planned to contact this same individual." Id. ¶ 140. However, Plaintiff states

that she contacted this individual because she knew him personally and was simply not aware that

the Board member planned to contact him. Pl.'s Aff. ¶ 244.

Second, Defendants state that Plaintiff failed to properly maintain a donor contact list by (1)

inappropriately delegating her responsibilities to volunteers, and (2) providing a list to Board

members without checking its accuracy. Defs.' SMF ¶ 142. However, Plaintiff states that using

volunteers for such work was normal, and that when presenting the list to Board members, she

specifically stated that the information should be checked for accuracy before contact; she never received any objections to her work in this regard.  Pl.'s Aff. ¶ 248.

Third, Defendants state that Plaintiff produced fundraising materials that included the word "pyramid," and continued to use these materials despite Yarbrough's instruction to stop because the word "pyramid" was reminiscent of a pyramid scheme.  Defs.' SMF ¶¶ 143-46.  However, Plaintiff states that these fundraising materials were produced by the National and approved by Yarbrough, who never told Plaintiff to stop using the term "pyramid."  Pl.'s Aff. ¶¶ 252-56.

Fourth, when Plaintiff emailed Michael Yehl ("Yehl"), the Chairman of the Board, seeking biographies of new Board members to be elected at an upcoming annual meeting, Yehl felt that Plaintiff was "stepping on [Yarbrough's] toes."  Defs.' SMF ¶¶ 147-48; Yarbrough Dec., Ex. H.  Plaintiff's conduct led Yarbourgh to "question Plaintiff's loyalty."  Yarbrough Dec. ¶ 27.  But according to Plaintiff, she was simply taking the same steps that she had done each year to prepare for the annual meeting.[5]  Pl.'s Aff. ¶ 260.

Fifth, Defendants state that after Yarbrough asked Plaintiff to make follow-up calls to individuals on the donor list, Plaintiff reached out to Backstrom and asked her to make the calls.  Defs.' SMF ¶¶ 151-52.  Plaintiff states that Yarbrough handed Plaintiff a list of 300 names and

---

[5] The email chain between Yehl and Yarbrough might, for the reasons discussed *infra*, support an inference of retaliatory animus on the part of Yarbrough.  Yarbrough writes: "there have been rumblings about this Annual Meeting for weeks. . . . I believe they have one set of plans that they are trying to put in motion, I may be paranoid, but that is what I think."  Yarbrough Dec., Ex. H.  Although the meaning of these statements is unclear in isolation, other evidence in the record indicates that volunteers and others dissatisfied with Yarbrough were planning to protest or otherwise air their grievances at the Chapter's meetings.  See, e.g., Defs.' SMF ¶ 242.  Because, as stated *infra*, these protest activities were to some degree related to opposition to alleged discrimination, Yarbrough's articulated suspicions regarding Plaintiff's involvement in the meeting might support an inference of retaliatory animus.

suggested she call as many as possible before a fundraising event scheduled for eight days later. Pl.'s Aff. ¶ 266. Plaintiff told Yarbrough she would do the best she could, and subsequently called Backstrom, head of the Board's fundraising committee, to ask if Board members might be interested in assisting with phone calls for the upcoming event. Id. ¶ 268. At Backstrom's request, Plaintiff wrote a script for the Board members. Id. Board members took 100 names to call, leaving Plaintiff with 200. Id. After Plaintiff had gone through 100 people on her own, she received a written warning from Yarbrough stating that using volunteers to help make the phone calls was an insubordinate act. Id.; Yarbrough Dec., Ex. M.

Sixth, Plaintiff emailed Backstrom asking for a copy of the Executive Director's job description. Defs.' SMF ¶¶ 153-54. Plaintiff explained in the email that Yarbrough and Darby had asked Plaintiff to make copies of all staff job descriptions, but she did not know if she had a current version of the Executive Director position. Yarbrough Dec., Ex. J. Backstrom forwarded this request to Yarbrough, Gordineer, and Yehl, accompanied by a message stating that Backstrom did not believe Plaintiff was "the appropriate person to be involved in this process." Id. Backstrom also stated that she "questioned" Plaintiff's motives, and advised that given "the current atmosphere with the senior staff, . . . it would be prudent to have [Yarbrough's] personnel file maintained at [Gordineer's] office." Id. Yarbourgh replied to Backstrom, Yehl, and Gordineer, stating that Plaintiff was "indeed up to something." Id. Plaintiff responds that she requested the job description because she believed she was specifically instructed to do so by Yarbrourgh and Darby, but was subsequently given a written warning charging her with insubordination.[6] Pl.'s Aff. ¶ 272.

---

[6] The written warning itself provides further evidence of pretext. See Yarbrough Dec., Ex. M. It states that Plaintiff's use of volunteers to make calls to donors and her emails to Board members requesting information constituted acts of "insubordination." Id. However, the definition

Seventh, Defendants state that Plaintiff failed to remind Board members to pay their campaign pledge, which was part of Plaintiff's development responsibilities. Defs.' SMF ¶ 155. Plaintiff states that she sent reminders to Board members who requested them, and that because Board members made their donations at different times, there was no regular schedule for sending reminders to all Board members. Pl.'s Aff. ¶ 274.

Finally, on April 21, 2008, Backstrom contacted Yarbrough regarding inaccuracies in the donor database. Defs.' SMF ¶ 159. Plaintiff counters that a different employee, Luz Rivera ("Rivera"), was responsible for maintaining the database. Pl.'s Aff. ¶ 282; see also Dkt. No. 163 ¶ 43. On May 6, 2008, Yarbrough learned that fundraising information she had sent to a local hospital in February 2008 had not been received because the person to whom she sent it had left her position in November 2007. Defs.' SMF ¶ 161; Yarbrough Dec., Ex. N. Yarbrough sent Plaintiff an email reprimanding her and stating that "it is your job to make sure all contact information provided is correct." Yarbrough Dec., Ex. N. Plaintiff states that there is no way she, or anyone else, could have known that a single support staff employee at a large hospital had left her job, and contends that ordinarily Yarbrough would simply have informed Rivera of the updated contact information. Pl.'s Aff. ¶ 286.

### iv. Disloyal Conduct

Defendants also state that Plaintiff was "working against the interests of the Chapter." Defs.' SMF ¶ 162. Specifically, Yarbrough was told that Plaintiff was meeting with disgruntled

---

of insubordination attached to the warning states that a charge of insubordination must show, *inter alia*, that the employee was "given a clearly expressed direct order" and "told that failure to obey the order will result in <u>discipline up to and including termination</u>." Id. There is no evidence that such a warning was given to Plaintiff in relation to these tasks. This inconsistency provides evidence of pretext. See Zann Kwan, 737 F.3d at 846.

volunteers who were trying to get Yarbrough fired and change the makeup of the Board.  Id. ¶ 164.

Additionally, Plaintiff met with senior staff employees who came to her to discuss meetings they

had with Yarbrough regarding their positions.  Id. ¶ 166.  Defendants assert that, as HR Director,

Plaintiff should have informed Yarbrough and the Board about "any discussions with the Chapter

staff," but failed to do so.  Id. ¶¶ 167-68.  Relatedly, Defendants state that, during the April 11, 2008

meeting between Plaintiff, Yarbrough, and Darby, Plaintiff stated that the Chapter could expect

picketing or lawsuits in the event of additional senior staff terminations.[7]  Id. ¶ 156.  Yarbrough

considered these remarks "threatening."  Yarbrough Dec. ¶ 28.

      Plaintiff states that she met with disgruntled volunteers and paid staff in her capacity as HR

Director, but did not work to create any "additional disruption" for the Chapter.  Pl.'s Aff. ¶ 294.

She further states that paid staff came to her as HR Director, because they were "fearful of

retaliation and discrimination by Yarbrough."  Id. ¶ 298.  Plaintiff could not report these complaints

to Gordineer, Yarbrough's supervisor, because Gordineer was involved in Yarbrough's allegedly

illegal activities.  Id.  Accordingly, Plaintiff states that she directed the employees and volunteers to

contact the CCL hotline.  Id.  As to the meeting with Yarbrough and Darby, Plaintiff states that, at

one point, while Yarbrough was out of the room, Darby told Plaintiff that Yarbrough was getting

tired of the senior staff team because they were not "working with her," and that Yarbrough could

fire all staff members "with or without cause."  Id. ¶ 276.  Darby then stated that "even high

achievers could be terminated if they were not good team players."  Id.  Plaintiff told Darby that

further terminations of senior staff would risk additional lawsuits.  Id.  By that time, Michael Raffe

---

[7] At least one staff member had been terminated by Yarbrough by April 2008.  See Dkt. No. 163 ¶ 27.

("Raffe"), a long-time Chapter employee terminated by Yarbrough, had filed an age discrimination lawsuit. Id. ¶ 278.

Defendants' proffer regarding Plaintiff's allegedly disloyal conduct is problematic. To the extent Defendants are arguing that Plaintiff was demoted because she joined in opposing allegedly discriminatory practices by Yarbrough and the Chapter, that explanation is not legitimate and non-retaliatory; it is evidence of impermissible retaliation against Plaintiff for engaging in protected activity. See Dangler v. N.Y.C. Off Track Betting Corp., 193 F.3d 130, 142 (2d Cir. 1999) (denying motion to dismiss first amendment retaliation claim where supervisor threatened to fire employee because he was not a "team player"). Although Plaintiff has not argued this point, her participation in the volunteer meetings, consultations with employees regarding their grievances with Yarbrough, and statements to Darby all might constitute protected activity. See, e.g.,. Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (stating that protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges"); Heller v. Champion Int'l Corp., 891 F.2d 432, 436 (2d Cir. 1989) (noting that antiretaliation provisions in employment discrimination statutes protect various "disloyal" acts by employees); Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1136-37 (5th Cir. Unit A 1981) (finding that Title VII antiretaliation provision protects picketing); Rusnak v. Hous. Auth. of City of Bridgeport, 963 F. Supp. 161, 170 (D. Conn. 1997) (emphasizing "the need to ensure that employees can assist others in utilizing informal grievance procedures without the threat of unchecked retaliation"). The Court nevertheless notes that, regardless of whether these acts constitute protected activity, Yarbrough and Darby's hostility provides evidence of retaliatory

23

animus.  Cf. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (noting that even non-actionable acts of discrimination may serve as background evidence of discrimination).

Defendants appear to believe that because Plaintiff's position included human resources responsibilities, Plaintiff could be disciplined for any HR-related conduct of which Yarbrough did not approve.  See, e.g., Defs.' SMF ¶¶ 168, 231.  This implied argument is dubious.  The NYSHRL expressly prohibits an employer from taking adverse action against a person because she has opposed *any* unlawful discriminatory practice.  N.Y. EXEC. LAW § 296(1)(e).  Accordingly, when an employee complains about or otherwise opposes conduct that she reasonably believes constitutes forbidden discrimination or retaliation, that activity is statutorily protected.  See Sumner, 899 F.2d at 209.  "Whether a human resources director who *neutrally* investigates a claim of discrimination nevertheless can be said to 'oppose' a discriminatory practice is an open question in this Circuit." Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 64 (2d Cir. 2012) (Lohier, J., concurring).  Here, however, Defendants contend that Plaintiff was, improperly in their view, siding with employees regarding their complaints of, among other things, discrimination and retaliation; Defendants perceived Plaintiff's role as oppositional, not neutral.[8]  See, e.g., Defs.' SMF ¶ 165.  Additionally, one of the primary issues discussed at the meetings with volunteers was the termination of Raffe. See, e.g., Dkt. No. 160 ¶ 66.  Raffe sued the Chapter and Yarbrough for age discrimination in January 2008.  Raffe v. Am. Nat'l Red Cross, No. 08-CV-0211 (N.D.N.Y.).  Accordingly, whether

---

[8] Conversely, it is possible that Plaintiff's assisting other employees in filing complaints and cautioning her employer as to possible litigation do not constitute protected activity because Plaintiff did not "step outside [her] ordinary employment role" of HR Director.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 49 (1st Cir. 2010).  In that case, Plaintiff was simply performing her job duties, exposing one of Defendants' articulated nonretaliatory reasons—that Plaintiff's performance of her human resources duties was deficient—as false.

or not Plaintiff's participation in the protests over Raffe's termination constitute protected activity, a rational factfinder could infer from Defendants' hostility to Plaintiff's participation that Plaintiff's subsequent reassignment was done with retaliatory intent.

Finally, to the extent Defendants are attempting to argue that Plaintiff's actions were "so unreasonable and disruptive" that they cannot receive protection, the evidence does not support that contention. See Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1570 (2d Cir. 1989). "Almost every form of 'opposition to an unlawful employment practice' is in some sense 'disloyal' to the employer, since it entails a disagreement with the employer's views and a challenge to the employer's policies." E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir. 1983). "Otherwise the conduct would not be 'opposition.'" Id.

As stated *supra*, to prevail at the pretext stage of the McDonnell-Douglas analysis, a plaintiff must show that the employer's proffered nonretaliatory reason is both false *and* a pretext for retaliation. There are disputed issues of fact as to whether Defendants' proffered reasons for reassigning Plaintiff were false. Furthermore, Defendants' hostility to Plaintiff's "disloyal" conduct, combined with the relative temporal proximity between Plaintiff's CCL Complaint and her reassignment, might support an inference that Defendants' proffered reasons are pretext for retaliation—i.e., that retaliation was the but-for cause of Plaintiff's reassignment. See Hicks, 509 U.S. at 511 (1993) ("[T]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."). Accordingly, Plaintiff has met her burden at the pretext stage, and Defendants are not entitled to summary judgment on Plaintiff's retaliation claim.

25

**B. Individual Liability**

Plaintiff seeks to impose individual liability on Yarbrough, Gordineer, and Darby.  <u>See</u> Second Am. Compl.  The NYSHRL makes it unlawful for "any employer" to discriminate against any person because she has opposed unlawful discrimination.  N.Y. EXEC. LAW § 296(1)(e).  "A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor actually participates in the conduct giving rise to the discrimination."  <u>Feingold v. New York</u>, 366 F.3d 138, 157 (2d Cir. 2004) (alterations and internal quotation marks omitted).  Additionally, the statute states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. EXEC. LAW § 296(6).  "To be found liable under this provision, an individual need not have supervisory or hiring and firing power but still must have *actually participated* in the conduct giving rise to the claim of discrimination and engaged in direct, purposeful, participation."  <u>Emmons v. City Univ. of New York</u>, 715 F. Supp. 2d 394, 420 (E.D.N.Y. 2010) (internal citation and quotation marks omitted).

Here, Yarbrough was primarily responsible for Plaintiff's reassignment, and according to Plaintiff, acted with retaliatory animus.  Accordingly, as a supervisor, Yarbrough may be held individually liable.

Additionally, a rational factfinder could determine that Darby actually participated in retaliatory action against Plaintiff, and is therefore individually liable.  Although Yarbrough had formal authority to reassign Plaintiff, Darby's close involvement both before and after Plaintiff's reassignment, as well as her statements at the April 11, 2008 meeting, might create a reasonable inference that she aided, abetted, or incited the retaliatory reassignment.  <u>See</u> Pl.'s SMF ¶ 176.

Gordineer, however, cannot be held individually liable. Plaintiff has not produced any evidence showing that Gordineer actually participated in her reassignment. Although Gordineer clearly encouraged the ultimately adverse changes to Plaintiff's position, Gordineer's role in this process predated the CCL Complaint. See, e.g., Gordineer Dec., Ex. C. There is no evidence showing that Gordineer subsequently participated in unlawful retaliation by aiding or abetting Yarbrough's allegedly retaliatory reassignment of Plaintiff in May 2008. Gordineer is therefore dismissed from the case.

## V.    LABOR LAW § 193

New York Labor Law § 193(1) prohibits an employer from making any deductions from the wages of an employee except when made in accordance with a governmental law or regulation, or when made for the benefit of the employee with the employee's express authorization. N.Y. LAB. LAW § 193(1). "Thus, the purpose of § 193 is to prohibit employers from making unauthorized deductions from wages and it 'was intended to place the risk of loss for such things as damaged, spoiled merchandise, or lost profits on the employer rather than the employee.'" Ireton-Hewitt v. Champion Home Builders Co., 501 F. Supp. 2d 341, 353 (N.D.N.Y. 2007) (quoting Hudacs v. Frito-Lay, 683 N.E.2d 322, 325 (N.Y. 1997)).

Plaintiff asserts that Defendants violated § 193 by paying her medical leave benefits based on the lower salary of the Volunteer Coordinator position rather than her previous salary as HR and Development Director. Second Am. Compl. ¶¶ 57-74. However, § 193 prohibits the unauthorized *deduction* of wages and benefits. Here, Defendants did not deduct anything from Plaintiff's benefits; they simply failed to pay the benefits to which Plaintiff claims she was entitled. See Strohl v. Brite Adventure Ctr., Inc., No. 08-CV-259, 2009 WL 2824585, at *9 (E.D.N.Y. Aug. 28, 2009)

(dismissing § 193 claim because the "defendants did not 'deduct' any amount from [the plaintiff's] wages, but simply failed to pay her all the wages she had earned"); <u>Ireton-Hewitt</u>, 501 F. Supp. 2d at 353 (stating that an employer's failure to pay benefits earned by an employee "do[es] not fall within the realm of § 193"). Accordingly, Plaintiff's § 193 claim fails as a matter of law.

## VI.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 140) for summary judgment is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 140) for summary judgment is **GRANTED** as to Plaintiff's: (1) Labor Law § 193 claim; and (2) Human Rights Law retaliation claim against Defendant Cynthia Gordineer. Defendants' Motion (Dkt. No. 140) is **DENIED** as to Plaintiff's Human Rights Law retaliation claim against Defendants the American National Red Cross, the American Red Cross of Tompkins County, Jennifer Yarbrough, and Dawn Darby; and it is further

**ORDERED**, that Defendant Cynthia Gordineer is **DISMISSED** from the case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:     September 29, 2014
           Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge